

1  Guido Saveri (22349) (guido@saveri.com)
   R. Alexander Saveri (173102) (rick@saveri.com)
2  Cadio Zirpoli (179108) (cadio@saveri.com)
   SAVERI & SAVERI, INC.
3  111 Pine Street, Suite 1700
   San Francisco, CA 94111
4  Telephone: (415) 217-6810
   Facsimile: (415) 217-6813
5
   Mark Reinhardt (m.reinhardt@rwblawfirm.com)
6  Garrett D. Blanchfield, Jr. (g.blanchfield@rwblawfirm.com)
   REINHARDT WENDORF & BLANCHFIELD
7  E-1250 First National Bank Building
   332 Minnesota Street
8  St. Paul, MN 55101
   Telephone: (651) 287-2100
9  Facsimile: (651) 287-2103

10 Attorneys for Plaintiff

                                                                    **MEJ**

11
                        UNITED STATES DISTRICT COURT
12
                      NORTHERN DISTRICT OF CALIFORNIA
13
                                CV  08       0615
14
   SCOTT FREDERICK, on behalf of himself and          Civil Action No. _____
15 all others similarly situated,
                                                       CLASS ACTION
16              Plaintiffs,
                                                       COMPLAINT
17 vs.
                                                       DEMAND FOR JURY TRIAL
18 AIR NEW ZEALAND, ALL NIPPON AIRWAYS,
   CATHAY PACIFIC AIRWAYS, CHINA
19 AIRLINES, EVA AIRLINES, JAPAN AIRLINES
   INTERNATIONAL, MALAYSIA AIRLINES,
20 NORTHWEST AIRLINES, QANTAS AIRWAYS,
   SINGAPORE AIR, THAI AIRWAYS, and
21 UNITED AIRLINES,

22              Defendants.

23

24        Plaintiff, by his undersigned attorneys, individually and on behalf of the class described

25 below, brings this action for damages and injunctive relief for price fixing under Section 1 of the

26 Sherman Act of 1890, 15 U.S.C. §1, and the antitrust laws of the United States against providers

27 of long haul trans-Pacific passenger flights ("trans-Pacific Air Passenger Transportation") to or

28 from the United States from at least May 2004 through August 2007 (the "Class Period").

   CLASS ACTION COMPLAINT          1

1

## I. NATURE OF THE CASE

2    1.    This case arises out of a long-running, international conspiracy among defendants

3    and their co-conspirators to fix the prices of trans-Pacific Air Passenger Transportation and the

4    Fuel Surcharges on this transportation. Fuel surcharges are fees charged by airlines to passengers

5    to compensate airlines for increased costs of fuel in used in transportation of passenger.

6    2.    This lawsuit is brought as a class action on behalf of all individuals and entities

7    who directly purchased, from Defendants, trans-Pacific Air Passenger Transportation and were

8    charged Fuel Surcharges on that transport from at least as early as May, 2004 through August,

9    2007.

10    3.    Because of Defendants' unlawful conduct, Plaintiff and other Class members paid

11    artificially inflated prices for Trans-Pacific Air Passenger Transportation and Fuel Surcharges

12    thereupon, and as a result, have suffered antitrust injury to their business or property.

13

## II. JURISDICTION AND VENUE

14    4.    This action is instituted under Section 4 of the Clayton Act, to recover treble

15    damages and costs of suit, including reasonable attorneys' fees, against Defendants for the

16    injuries sustained by Plaintiff and the members of the Class by reason of the violations, as

17    hereinafter alleged, of Section 1 of the Sherman Act.

18    5.    Jurisdiction is conferred upon this Court by 28 U.S. C. §§ 1331 and 1337 and by

19    Section 4 of the Clayton Act, 15 U.S.C. §15 and Section 1 of the Sherman Act, 15 U.S.C. § 1.

20    6.    Venue is found in this district pursuant to Sections 15 and 22 of the Sherman Act,

21    and 28 U.S.C. §1391(b), (c). Venue is proper in this judicial district because during the Class

22    Period one or more of the Defendants resided, transacted business, was found, or had agents in

23    this district, and because a substantial part of the events giving rise to Plaintiff's claims occurred,

24    and a substantial portion of the affected interstate trade and commerce described below has been

25    carried out in, this district.

26    7.    Upon information and belief, Defendants maintain offices, have agents, transact

27    business, or are found within this judicial district.

28    8.    This Court has in *personam* jurisdiction over each of the Defendants because,

CLASS ACTION COMPLAINT    2

1   *inter alia*, each Defendant: (a) transacted business in the United States; (b) directly or indirectly

2   sold and provided Trans-Pacific Air Passenger Transportation and Fuel Surcharges throughout

3   the United States; (c) had substantial aggregate contacts with the United States as a whole; and/or

4   (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had the intended

5   effect of causing injury to, persons and entities residing in, located in, or doing business

6   throughout the United States, including in this district. Alternatively, there is jurisdiction over

7   foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

8                                    **III. PLAINTIFF**

9           9.      Plaintiff Scott Frederick ("Plaintiff" or "Frederick"), is a resident of the state of

10  Washington. Frederick directly purchased Trans-Pacific Air Passenger Transportation from one

11  or more of the Defendants during the Class Period and was injured as a result of Defendants'

12  illegal conduct. The price that Plaintiff paid to Defendants or their co-conspirators was greater

13  than it would have been absent the conspiracy herein alleged. As a result of the alleged

14  conspiracy, Plaintiff was injured in his business and property by reason of the antitrust violations

15  alleged herein. Plaintiff asserts a claim on behalf of itself and all direct purchasers of

16  Trans-Pacific Air Passenger Transportation from one or more of the Defendants during the Class

17  Period.

18                                   **IV. DEFENDANTS**

19          10.     Defendant Air New Zealand is a New Zealand company with its principal place

20  of business at Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand. Air New

21  Zealand conducts long haul trans-Pacific Air Passenger Transportation throughout the world,

22  including into the U.S. and especially California.

23          11.     Defendant All Nippon Airways is a Japanese company with its principal place of

24  business at Shidome-City Center, 1-5-2, Higashi-Shimbashi, Minato-ku, Tokyo 105-7133, Japan.

25  All Nippon Airways conducts long haul trans-Pacific Air Passenger Transportation throughout

26  the world, including into the U.S. and especially California.

27          12.     Defendant Cathay Pacific Airways is a Hong Kong-based company with its

28  principal place of business at 9 Connaught Road, Central Swirel Housepox Box 1 GPO, Hong

CLASS ACTION COMPLAINT            3

1  Kong K3. Cathay Pacific Airways conducts long haul trans-Pacific Air Passenger Transportation
2  throughout the world, including into the U.S. and especially California.

3      13.    Defendant China Airlines is a Taiwanese company with its principal place of
4  business at 131 Nanking E Rd., Section 3, Taipei, Taiwan. China Airlines conducts long haul
5  trans-Pacific Air Passenger Transportation throughout the world, including into the U.S. and
6  especially California.

7      14.    Defendant EVA Airways is a Taiwanese company with its principal place of
8  business at 16F0I, No. 207, Fusing Road, Taoyuan City, Taoyuan County, Taiwan. EVA
9  Airways conducts long haul trans-Pacific Air Passenger Transportation throughout the world,
10  including into the U.S. and especially California.

11      15.    Defendant Japan Airlines International is a Japanese company with its principal
12  place of business at 4-11, Higashi-Shinagawa 2-chrome, Shinagawa-Ku, Tokyo 140-8605, Japan.
13  Japan Airlines International conducts long haul trans-Pacific Air Passenger Transportation
14  throughout the world, including into the U.S. and especially California.

15      16.    Defendant Malaysia Airlines is a Malaysian corporation with its principal place of
16  business at MAS Complex A, Sultan Abdul Azia Shah Airport, 47200 Suband, Selangor Darui
17  Ehsan, Malaysia. Malaysia Airlines conducts long haul trans-Pacific Air Passenger
18  Transportation throughout the world, including into the U.S. and especially California.

19      17.    Defendant Northwest Airlines is a Delaware corporation with its principal place
20  of business at 2700 Lone Oak Parkway, Eagan, MN 55121. Northwest Airlines conducts long
21  haul trans-Pacific Air Passenger Transportation throughout the world, including into the U.S. and
22  especially California.

23      18.    Defendant Qantas Airways is an Australian company with its principal place of
24  business at Building A, 203 Coward Street, Mascot NSW 2020, Australia. Qantas Airways
25  conducts long haul trans-Pacific Air Passenger Transportation throughout the world, including
26  into the U.S. and especially California.

27      19.    Defendant Singapore Airlines is a Singapore company with its principal place of
28  business at Airline House, 25 Airline Road, 819829 Singapore. Singapore Airlines conducts

CLASS ACTION COMPLAINT          4

long haul trans-Pacific Air Passenger Transportation throughout the world, including into the U.S. and especially California.

20. Defendant Thai Airways is a Thailand company with its principal place of business at 89 Vibhavadi-Rangsit Road, Bangkok, Thailand 10900. Thai Airways conducts long haul trans-Pacific Air Passenger Transportation throughout the world, including into the U.S. and especially California.

21. Defendant United Airlines is a Delaware corporation with its principal place of business at 77 W. Wacker Drive, Chicago, IL 60601. United Airlines is one of the largest passenger airlines in the world with more than 3,600 flights a day to more than two hundred destinations. United Airlines conducts long haul trans-Pacific Air Passenger Transportation throughout the world, including into the U.S. and especially California.

22. The acts alleged to have been done by Defendants were authorized, ordered or done by their directors, officers, agents, employees, or representatives while actively engaged in the management of each of the Defendants' affairs.

### V. CO-CONSPIRATORS AND AGENTS

23. Other natural persons, corporations, and entities not named as defendants herein, may have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

24. Whenever in this Complaint reference is made to an act, statement, or transaction of business by any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted business by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

### VI. INTERSTATE AND FOREIGN TRADE AND COMMERCE

25. Plaintiff incorporates by reference as if fully set forth herein, the allegations contained in this Complaint.

26. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate and international

CLASS ACTION COMPLAINT          5

1  commerce.

2      27.    During the time period covered by this Complaint, Defendants and their co-

3  conspirators sold and provided trans-Pacific Air Passenger Transportation to, from and

4  throughout the United States.

5      28.    Each of the Defendants and their co-conspirators used instrumentalities of

6  interstate and/or foreign commerce to sell and market trans-Pacific Air Passenger Transportation.

7      29.    Defendants and their co-conspirators sold and provided substantial quantities of

8  trans-Pacific Air Passenger Transportation in a continuous and uninterrupted flow of interstate

9  and foreign commerce to customers located in states and nations other than the states and nations

10  in which Defendants were located, including this District.

11     30.    The global market for trans-Pacific Air Passenger Transportation is in the billions

12  of dollars.

13                    **VII. FACTUAL ALLEGATIONS**

14     31.    At all relevant times herein, Defendants were airlines that conducted and sold

15  Passenger Air Transportation, and charged fixed Fuel Surcharges on that transport, to airline

16  passengers in the United States and throughout the world, including but not limited to flights to

17  and from Los Angeles and to and from San Francisco, California. Los Angeles International

18  Airport ("LAX") and San Francisco International Airport ("SFO") are considered the

19  international U.S. gateways to Asian and Pacific countries. The U.S. Department of

20  Transportation reported that in 2005 LAX and SFO were ranked in the top U.S. passenger

21  gateways to the world in scheduled passenger service. That year LAX and SFO had 24.6 million

22  gateway passengers, with the foreign share of the passengers at an average 67%.

23     32.    Defendants are among the largest providers of trans-Pacific Air Passenger

24  Transportation. Defendants' principal competitors in the long-haul trans-Pacific Air Passenger

25  Transportation market are therefore each other.

26     33.    Trans-Pacific Air Passenger Transportation is a commodity product that is

27  fungible in the sense that trans-Pacific Air Passenger Transportation provided by any one airline

28  is readily substitutable for the trans-Pacific Air Passenger Transportation provided by any other

CLASS ACTION COMPLAINT          6

1    airline.

2    34.    Trans-Pacific Air Passenger Transportation is a homogenous service sold by
3    airlines including Defendants, to airline customers, including Plaintiff and the members of the
4    Class, primarily based on price.

5    35.    Generally, surcharges are a feature of the global air transportation market, in
6    which airlines negotiate to charge extra fees to their customers, above and beyond basic flight
7    rate charges, with the intent of defraying certain external costs of the carriers.

8    36.    Beginning at least as early as May 1, 2004, Defendants conspired, contracted or
9    combined for the purpose of and with the effect of instituting, raising, fixing, maintaining and
10    stabilizing the price of fuel surcharges imposed on purchasers of trans-Pacific Air Passenger
11    Transportation tickets.

12    37.    As Defendants controlled a vast majority of the trans-Pacific Air Passenger
13    Transportation during the class Period with their dominant combined market share, trans-Pacific
14    Air Passenger Transportation flight purchasers were unable to shop for these products from other
15    carriers during that period, because of the lack of competition which allowed Defendants to reap
16    enormous profits from the Fuel Surcharges.

17    38.    In addition, Fuel Surcharges were often treated by Defendants and other carriers
18    similar to a tax or other surcharge, such as an airport facility charge or a government mandated
19    September 11 security charge. As such, Fuel Surcharges were not always advertised as part of
20    Defendants' fares, and were added on to the base fare as part of the purchase transaction.

21    39.    Because surcharges generally are designed to compensate for increased external
22    costs, they should bear a relatively constant relationship to external cost levels. thus, in a
23    competitive market, Fuel Surcharges should rise and fall at relatively constant ratios to the
24    associated jet fuel costs. Since their inception in 2004, the ratio of Defendants' Surcharges to
25    external costs has increased steadily. The Fuel Surcharges bore no relationship to the
26    Defendants' actual fuel costs or fuel cost increases.

27    40.    The ratio of Defendants' profits to external costs were therefore quite high due to
28    the concerted implementation and maintenance of the agreed-upon trans-Pacific Air Passenger

CLASS ACTION COMPLAINT         7

1   Transportation and Fuel Surcharge price levels. So despite increased fuel costs during the Class
2   Period, Defendants' Surcharges were actually responsible for outstanding profit growth for
3   Defendants beyond record fuel costs.

4   41.     Each Defendant possesses significant market share on their routes of travel. The
5   principal competitors for the Defendants in the transpacific long haul trans-Pacific Air Passenger
6   Transportation market are therefore one another.

7   42.     Trans-Pacific Air Passenger Transportation is a commodity product that is
8   fungible in the sense that trans-Pacific Air Passenger Transportation provided by any one airline
9   is readily substitutable for the trans-Pacific Air Passenger Transportation provided by any other
10  airline.

11  43.     Trans-Pacific Air Passenger Transportation is a homogenous service sold by
12  airlines, including Defendants, to airline customers, including Plaintiffs and the members of the
13  Class, primarily based on price.

14  44.     The trans-Pacific Air Passenger Transportation market in the United States and
15  worldwide is highly concentrated, and there exists substantial barriers to entry in this market;
16  both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel
17  such as that perpetrated by Defendants and alleged herein.

18  45.     Generally, surcharges are a feature of the global air transportation market, in
19  which airlines charge extra fees to their customers, above and beyond basic flight rate charges,
20  with the intent of defraying certain external costs of the carriers.

21  46.     Beginning in 2004, Defendants agreed to act in concert with one another in
22  demanding the Surcharges to defray fuel costs and agreeing when and how much to increase the
23  Surcharges to their trans-Pacific Air Passenger Transportation customers.

24  47.     Defendants were aware that their imposition of Fuel Surcharges and other
25  surcharges would not be successful if their supposed competitors did not join them; otherwise,
26  customers would be free to seek out lower prices. For this reason, Defendants entered into
27  agreements to raise surcharges at the same times and in the same amounts.

28  48.     But for Defendants' trans-Pacific Air Passenger Transportation conduct,

CLASS ACTION COMPLAINT          8

1  Defendants would have been unable to perpetrate the extent to which they increased the prices of
2  their Fuel Surcharges.

3      49.     The collusion of Japan Airlines International and All Nippon Airways ("ANA") is
4  representative of the behavior of the other Defendants. Japan Airlines International and ANA
5  agreed to raise and lower fares on nearly always the same dates and were in lockstep on
6  surcharges for transpacific fares:

7

8  June 8, 2004, ANA files a notice with the

9  Japanese government to raise IATA

10 international fares, in the wake of increased

11 fuel prices, to and from Japan, effective July

12 1, 5% hike, exception North America

13 economy fares, but not business class.

14

15 January 5, 2005, ANA announces it will add

16 fuel surchargtes on international fares on

17 February 1. The surcharges for transpacific

18 flights were 2,500 yen.

19

20 June 3, 2005, Japan Airlines files a notice

21 with the Japanese government to raise its

22 international fuel surcharge effective July 1.

23

24 January 16, 2006, Japan Airlines files a notice

25 with the Japanese government to raise its

26 international fuel charge effective March 1.

27

28

June 8, 2004, Japan Airlines files a notice with
the Japanese government to raise international
fares, in the wake of increased fuel prices, to
and from Japan, effective July 1, 5% hike,
exception North America economy fares, but
not business class.

January 20, 2005, Japan Airlines announces it
will add fuel surcharges on international
passenger fares on February 1. The surcharges
for transpacific flights were 2,500 yen.

June 7, 2005, ANA files a notice with the
Japanese government to raise its international
fuel surcharge effective July 7.

January 23, 2006, ANA files a notice with the
Japanese government to raise its international
fuel surcharge, effective March 1.

CLASS ACTION COMPLAINT            9

1  August 17, 2006, Japan Airlines files a notice
2  with the Japanese government to raise its
3  international fuel surcharge, effective October
4  1, from 8,000 yen to 13,600 yen ($66 to $113).

August 31, 2006, ANA files a notice with the
Japanese government to raise its international
fuel surcharge, effective October 15, from
8,000 yen to 13,600 yen ($66 to $113).

5

6  November 16, 2006, Japan Airlines files a
7  notice with the Japanese government to reduce
8  the fuel surcharge in international passenger
9  fares effective January 1, lowering the
10 surcharge from 13,600 yen to 13,000 yen
11 ($113 to $108).

November 16, 2006, ANA files a notice with
the Japanese government to reduce the fuel
surcharge on international passenger fares
effective January 1, lowering the surcharge
from 13,600 yen to 13,000 yen ($113 to $108).

12

13 March 19, 2007, Japan Airlines files a notice
14 with the Japanese government to reduce the
15 fuel surcharge on international passenger fares
16 effective May 1, to 11,000 yen or $91.

March 20, 2007, ANA files a notice with the
Japanese government to reduce the fuel
surcharge on international passenger fares
effective May 1, to 11,000 yen or $91.

17

18 May 15, 2007, Japan Airlines files a notice
19 with the Japanese government to raise the fuel
20 surcharge on international passenger fares
21 effective July 1, from 11,000 yen or $91 to
22 12,000 yen or $100.

May 25, 2007, ANA files a notice with the
Japanese government to raise the fuel surcharge
on international passenger fares effective July
10, from 11,000 yen or $91 to 12,000 yen or
$100.

23

24 August 15, 2007, Japan Airlines files a notice
25 with the Japanese government to raise the fuel
26 surcharge on international passenger fares
27 effective October 1, from 12,000 yen or $100
28 to 13,000 yen or $108.

August 20, 2007, ANA files a notice with the
Japanese government to raise the fuel surcharge
on international passenger fares effective
October 1, from 12,000 yen or $100 to 13,000
yen or $108.

CLASS ACTION COMPLAINT          10

50. Defendants' executives, as well as other air carriers' executives, met formally or informally over the years at various trade meetings or meetings of trade associations, such as the International Air Transport Association, the Association of Asian Pacific Airlines, oneworld, Star Alliance and SkyTeam Alliance. At one or more of these meetings Defendants conspired to artificially inflate fuel Surcharges on international passenger air transportation.

51. One of the keys to the conspiracy is the 42-year-old Association of Asia Pacific Airlines ("AAPA"). The 17-member trade association, based in Kuala Lumpur, Malaysia, is the most significant group representing Asia/Pacific carriers. The AAPA boasts that its "member airlines carry 285 million passengers and 10 million tonnes of cargo representing approximately one-fifth of global passenger traffic and one-third of global air cargo traffic respectively." Ten of the defendants are members of AAPA.

52. The primary purpose of AAPA is to serve as a forum for members' views on issues of common interest and to foster close cooperation. According to the organization, "AAPA speaks with a common voice on behalf of the Asia Pacific carriers and puts forard Asian perspectives when dealing with governments, aircraft manufacturers, airport authorities and other organizations on industry issues. The activities of the Association cover every aspect of civil aviation where the airlines feel they can work together for mutual benefit. In addition, AAPA retains access to specialized legal and aviation consultants in Brussels and Washington, a reflection of the significant impact which the profusion of U.S. and E.U. regulatory developments have on all international carriers including Asia Pacific airlines."

53. AAPA was formed during a meeting of Asian airline executives in 1965 to discuss regional cooperation. The following year, Philippine Airlines, China Airlines, Korean Airlines and Malaysian Airlines officially formed the Orient Airlines Research Bureau. The group evolved into the Orient Airlines Association and in 1996 changed its name to Association of Asia Pacific Airlines.

54. Another key to the conspiracy is the Geneva-based International Air Transport Association. All of the defendants are members of the IATA, which was founded in 1945 in Havana, Cuba. IATA represents more than 240 airlines comprising 94% of scheduled

CLASS ACTION COMPLAINT                11

international air traffic. It describes itself as "the prime vehicle for inter-airline cooperation." It was an agreement reached at an IATA meeting in Geneva on May 24, 2004 that played a role in triggering the fuel Surcharge conspiracy.

55.    Alliance members by airline:

Air New Zealand

- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association

All Nippon Airways

- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association

American Airlines

- Member of oneworld.
- Member of the International Air Transport Association.

Cathay Pacific Airways

- Member of the Association of Asia Pacific Airlines.
- Member of oneworld.
- Member of the International Air Transport Association.

China Airlines

- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

EVA Airlines

- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

Japan Airlines International

- Member of the Association of Asia Pacific Airlines
- Member of oneworld.

CLASS ACTION COMPLAINT          12

1       •       Member of the International Air Transport Association.

2       Malaysia Airlines

3       •       Member of the Association of Asia Pacific Airlines.

4       •       Member of the International Air Transport Association.

5       Northwest Airlines

6       •       Member of the SkyTeam Alliance.

7       •       Member of the International Air Transport Association.

8       Qantas Airways

9       •       Member of the Association of Asia Pacific Airlines.

10      •       Member of oneworld.

11      •       Member of the International Air Transport Association.

12      Singapore Airlines

13      •       Member of the Association of Asia Pacific Airlines.

14      •       Member of the Star Alliance.

15      •       Member of the International Air Transport Association.

16      Thai Airways

17      •       Member of the Association of Asia Pacific Airlines.

18      •       Member of the Star Alliance.

19      United Airlines

20      •       Member of the Star Alliance.

21      •       Member of the International Air Transport Association.

22      56.     In addition to the four different alliances/trade groups, various defendants are in

23      effect business partners with each other through what is called code sharing. Code sharing is a

24      business term which was first originated in 1990 when Qantas Airways and American Airlines

25      combined services between an array of U.S. and Australian cities. Code sharing is a legal

26      business arrangement. However, it provides a mechanism to conduct illegal activity.

27      57.     A code share is part of a "cooperative services" agreement between the two

28      carriers. It refers to the practice where a flight operated by an airline is jointly marketed as a

CLASS ACTION COMPLAINT              13

flight for one or more other airlines. Most major airlines today have code sharing partnerships with other airlines. "Code" refers to the identifier used in flight schedule, generally the 2-character International Air Transport Association airline designator code and flight number. For example, YY123, flight 123 operated by the airline YY, could be sold by airline ZZ as ZZ456. It is a business partnership that allows airlines to earn revenue by selling tickets on a partner's flight.

58.    According to the U.S. Department of Transportation and Defendants, the following are the code sharing partnerships of the defendants listed alphabetically:

Air New Zealand / EVA Airways
Air New Zealand / Qantas (Tasman route)
Air New Zealand / Japan Airlines International
Air New Zealand / Northwest Airlines
Air New Zealand / Singapore Airlines
Air New Zealand / Thai Airways
Air New Zealand / United Airlines

All Nippon Airways / Asiana Airlines
All Nippon Airways / EVA Airways
All Nippon Airways / Malaysia Airlines
All Nippon Airways / Singapore Airlines
All Nippon Airways / United Airlines

Cathay Pacific Airways / American Airlines
Cathay Pacific Airways / Japan Airlines International

China Airlines / American Airlines
China Airlines / Thai Airways

EVA Airways / Air New Zealand
EVA Airways / American Airlines
EVA Airways / All Nippon Airways
EVA Airways / Qantas
EVA Air / American Airlines

Japan Airlines International / Air New Zealand
Japan Airlines International / American Airlines
Japan Airlines International / Cathay Pacific
Japan Airlines International / Korean Air
Japan Airlines International / Northwest Airlines
Japan Airlines International / Qantas Airlines
Japan Airlines International / Singapore Airlines
Japan Airlines International / Thai Airways

Malaysia Airlines / All Nippon Airways
Malaysia Airlines / Thai Airways

Northwest Airlines / Air New Zealand
Northwest Airlines / Asiana Airlines

CLASS ACTION COMPLAINT            14

Northwest Airlines / Japan Airlines International
Northwest Airlines / Korean Air

Qantas Airways / Air New Zealand
Qantas Airways / American Airlines
Qantas Airways / EVA Airways
Qantas Airways / Japan Airlines International

Singapore Airlines / Air New Zealand
Singapore Airlines / Asiana Airlines
Singapore Airlines / All Nippon Airways
Singapore Airlines / Malaysian Airlines
Singapore Airlines / United Airlines

Thai Airways / Air New Zealand
Thai Airways / China Airlines
Thai Airways / Japan Airlines International
Thai Airways / Malaysia Airlines
Thai Airways / United Airlines

United Airlines / Air New Zealand
United Airlines / All Nippon Airways
United Airlines / Asiana Airlines
United Airlines / Singapore Airlines
United Airlines / Thai Airways

59.    Over the years, executives of Defendant airlines have attended numerous meetings where cartel-like activity was accomplished. Here are a few examples of meetings where executives discussed and agreed on fuel surcharges:

60.    The International Air Transport Association, Special Meeting, Geneva, May 28, 2004. Fuel costs were the main topic of this meeting and there were agreements on how to add surcharges for fuel. The Montreal Gazette reported on June 1, 2004, that "member carriers of the International Air Transport Association might raise international fares by as much as five percent to help cover a surge in jet fuel costs. The proposed fare increase of between two percent and five percent was agreed at a May 28 meeting of the association, which represents more than 270 airlines worldwide, an IATA spokesperson said."

61.    The International Air Transport Association Annual General Meeting and World Air Transport Summit, Singapore, June 6-8, 2004. More than 600 airline executives attended this annual summit. Giovanni Bisignani, IATA CEO said in a welcoming statement, "While record high fuel prices challenge our profitability it is time to put our efforts toward rebuilding the industry." Immediately following this meeting on June 8, 2004 both Japan Airlines

CLASS ACTION COMPLAINT          15

International and All Nippon Airways filed applications with the Japanese government to raise international passenger fares because of high fuel costs. In a news release announcing the Fuel Surcharge hike, Japan Airlines International said:

"The application follows a special meeting of the members of the International Air Transport Association in Geneva, may 28, (2004) when a resolution was discussed to raise fares in the wake of increased fuel prices. This resolution has now been adopted."

Japan Airlines International and All Nippon Airways were in lockstep on June 8, 2004, both announcing on that day that a five percent fuel Surcharge would go into effect, on the same day for both airlines, July 1, 2004.

62.    2005 International Flight Services Association, Global Leadershihp Conference - Asia Pacific, August 30 - September 1, 2005 Tokyo Japan: This meeting was labeled as "The Challenge of Change." Among the participants were, Makoto Fukada, Managing Director and Senior Vice President International Passenger, Japan Airlines; Sandra Pineau, Senior Director of Planning and Design, Continental Airlines; Charles Grossrieder, a manager at Cathay Pacific Airways; Nikom Raviyan, Vice President, Thai Airways; Sandeep Bahl, General Manager, Norwest Airlines, Shigeru Miyata, Vice President, Japan Airlines; Kriengsakdi Phatharacharukulk, Director, Thai Airways; and Hee Won Jo, Senior Manager, Asiana Airlines.

63.    2nd Annual Asia Pacific & Middle East Aviation Outlook Summit 2006, December 5-6, 2005 Kuala Lumpur, Malaysia: The theme of this meeting was "Towards Best Practice; Maximising Revenues and Minimising Costs." On the first day of the meeting, the guests included Dato Seri Bashir Ahmad, Malaysia Airport's CEO; Willy Boulter, Commercial Director for Virgin Atlantic Airays; and Stanley Kuppusamy, President, International Relations, Singapore Airlines. Fuel surcharges were a topic of discussion.

64.    Aviation Emergency Response 2006, AAPA sponsored, September 19-21, 2006, Bangkok, Thailand: This meeting was attended by international airport officials and AAPA member executives. Meetings were held on increasing revenues in the transpacific area by way of Fuel Surcharges and other financial means.

CLASS ACTION COMPLAINT                    16

65.     3rd Annual Asia Pacific & Middle East Aviation Outlook Summit, November 9-10, 2006 Singapore: Participating in this meeting were executives from most of the Defendant airlines, including Geoff Dixon, CEO of Qantas and Huang Cheng Eng, Executive VP for Singapore Airlines. One of the issues presented and discussed was *"Fighting Costs: Fuel prices and managing risk exposure."*

66.     AAPA Forum, November 28-29, 2006 Bandar Seri Begawan, Brunei Darussalam. More than 120 aviation industry stakeholders attended this meeting, organized by AAPA. At this meeting, Defendants and others discussed surcharges.

67.     Asia Pacific Aviation Summit, July 24-25, 2007 Sydney, Australia: This meeting was put on by the Asia Pacific aviation industry. Some of the issues discussed included the impact of the investigation by the U.S. Department of Justice into fare price fixing. Another topic was "working together efficiently" to diffuse the investigation of added surcharges.

68.     The U.S. Department of Justice ("DOJ") started investigating air passenger fuel surcharge conspiracies worldwide in 2006, particularly transatlantic routes and transpacific routes to and from the West Coast. The DOJ announced on August 1, 2007 a $300 million settlement with British Airways and it cited passenger transatlantic routes. In its news release, the DOJ said: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by fixing the Fuel Surcharge charged to passengers on long-haul international flights, including flights between the United States and the United Kingdom."

69.     The DOJ also focused on transpacific flights to and from the Untied States, noting that investigation is "ongoing" and includes other Defendants named herein.

70.     The DOJ also announced a settlement with Korean Air for fare price fixing on flights from the United States to Korea. The DOJ stated that Korean Air has "agreed to cooperate with the Department's ongoing investigation." Korean Air's unnamed co-conspirator in the passenger fare price fixing via Fuel Surcharges was widely reported to be Asiana Airlines, which sought amnesty.

71.     Under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, a

CLASS ACTION COMPLAINT          17

1 company can apply for leniency from the Department of Justice for its participation in antitrust

2 activities. Under the so-called Corporate Leniency Program, if a company comes forward with

3 information about antitrust activities and cooperates in the investigation, it is eligible for

4 conditional amnesty from prosecution.

5     72.    Both Korean Air and Asiana Airlines are among the top transpacific carriers in the

6 world. It was not the first time Korean Air and Asiana Airlines have been implicated in collusion

7 and anticompetitive behavior. The Korean Fair Trade Commission fined Korean Air and Asiana

8 in 2001 for conspiring to set passenger air transportation services in Korea.

9     73.    In addition, several of the Defendants and unnamed co-conspirators have been

10 identified as targets and or subjects in international investigations by the U.S. Department of

11 Justice and the European Union into air cargo fuel surcharge price fixing. The targets, many of

12 which are also named in civil suits, include All Nippon Airways, American Airlines, Asiana

13 Airlines, Japan Airlines, Korean Airlines, Northwest Airlines, Qantas Airways and United

14 Airlines. In both the air passenger and cargo investigations, Defendants and other airlines are

15 accused of developing and participating in conspiracies to increase revenue by assessing inflated

16 Fuel Surcharges.

17     74.    On August 13, 2007, Qantas Chief Executive Officer Geoff Dixon announced that

18 Qantas Airways would set aside $40 million to cover a potential fine in the United States as a

19 result of Fuel Surcharges and price fixing in its freight division. In a news release, Dixon was

20 quoted as saying:

21     "On 1 August 2007, the U.S. Department of Justice announced that British

22     Airways and Korean Air had agreed to plead guilty and pay separate US$300

23     million criminal fines for their roles in conspiracies to fix prices of passenger and

24     cargo flights. British Airways subsequently announced that US$200 million of its

25     fine related to cargo. Based on these developments, a decision has been made to

26     make a US$40 million (A$47 million) provision in the 2006/07 Financial

27     Accounts!"

28 Dixon also was quoted as saying:

CLASS ACTION COMPLAINT     18

1    "We have investigated this issue thoroughly and are confident that the

2    unacceptable conduct was limited to a small number of people."

3    75.    On October 6, 2007, the Japanese daily newspaper *Asahji Shimbun* reported that

4    Japan Airlines International would book a roughly $171 million charge for potential fines from a

5    global price fixing probe by U.S. and European Union officials. The newspaper said:

6        "The company's move comes after the U.S. Justice Department fined British

7        Airways PLC and Korean Air Lines Co. $300 million each in August for fixing

8        the prices of passenger and cargo flights with other airlines. The companies

9        allegedly conspired to set fuel surcharges when oil prices rose."

10

11                        **VIII. CLASS ACTION ALLEGATIONS**

12    76.    Plaintiff brings this action on behalf of itself and all others similarly situated (the

13    "Class") pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). The Class is defined

14    as follows:

15        All purchasers of trans-Pacific passenger air transportation services
         by Air Passenger carriers ("trans-Pacific Air Passenger
16        Transportation") for long-haul flights from Defendants and their
         co-conspirators (the "Class"), at any time from May 2004 to
17        August 2007 (the "Class Period"), the exact date being unknown.
         Excluded from the Class are Defendants, any subsidiaries or
18        affiliates of Defendants, other providers of Air Passenger
         Transportation, and any of Defendants' co-conspirators, whether
19        named or not named as a Defendant in this Complaint.

20    77.    The Class is so numerous and geographically dispersed that joinder of all

21    members is impracticable.

22    78.    There are questions of law and fact common to the Class. These common

23    questions relate to the existence of the conspiracy alleged, and to the type and common pattern of

24    injury sustained as a result thereof. The questions include but are not limited to:

25        a.    Whether Defendants and their co-conspirators engaged in a combination

26    and conspiracy among themselves to fix, raise, maintain or stabilize prices of trans-

27    Pacific Air Passenger Transportation sold in the United States;

28        b.    The identity of the participants in the conspiracy;

CLASS ACTION COMPLAINT          19

c.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

d.    Whether Defendants undertook actions to conceal the unlawful conspiracy, contract or combination described herein;

e.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

f.    The effect of Defendants' conspiracy on the prices of trans-Pacific Air Passenger Transportation sold in the United States during the Class Period; and

g.    The appropriate measure of damages sustained by Plaintiff and other members of the Class.

79.    Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of other Class members, and Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is a direct purchaser of trans-Pacific Air Passenger Transportation from one or more of the Defendants. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class. In addition, Plaintiff is represented by competent counsel experienced in the prosecution of antitrust and class action litigation.

80.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

81.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

82.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

83.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records exist

CLASS ACTION COMPLAINT    20

1   in the files of Defendants and their co-conspirators. Prosecution as a class action will eliminate

2   the possibility of repetitious litigation. Treatment as a class action will permit a large number of

3   similarly situated persons to adjudicate their common claims in a single forum simultaneously,

4   efficiently and without duplication of effort and expense that numerous individual actions would

5   engender. Class treatment will also permit the adjudication of relatively small claims by many

6   class members who otherwise could not afford to litigate an antitrust claim such as is asserted in

7   this Complaint. This class action presents no difficulties of management that would preclude its

8   maintenance as a class action.

## IX.  TRADE AND COMMERCE

10     84.    During the relevant time period, Defendants collectively controlled a significant

11   share of the market for trans-Pacific Air Passenger Transportation, both globally and in the

12   United States.

13     85.    Each of the Defendants and their co-conspirators used instrumentalities of

14   interstate and/or foreign commerce to sell and market trans-Pacific Air Passenger Transportation.

15     86.    The business activities of the Defendants substantially affected interstate trade and

16   commerce.

## X.  FRAUDULENT CONCEALMENT

18     87.    Throughout and beyond the conspiracy, Defendants and their co-conspirators

19   affirmatively and actively concealed their unlawful conduct from Plaintiff. Defendants and their

20   co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of

21   their higher-level executives. Defendants and their co-conspirators publicly provided pre-textual

22   and false justifications regarding their price increases. Defendants and their co-conspirators

23   conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts

24   in furtherance thereof, and actively concealed their activities through various other means and

25   methods to avoid detection. Plaintiff did not discover, an could not have discovered through the

26   exercise of reasonable diligence, that Defendants and their co-conspirators were violating the

27   antitrust laws as alleged herein until shortly before this class action litigation was commenced.

28     88.    As a result of the active concealment of the conspiracy by Defendants and their

CLASS ACTION COMPLAINT    21

co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 by artificially reducing or eliminating competition in the United States.

89.    In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of trans-Pacific Air Passenger Transportation sold in the United States.

90.    As a result of Defendants' unlawful conduct, trans-Pacific Air Passenger Transportation prices were raised, fixed, maintained and stabilized in the United States.

91.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

92.    For purposes of formulating and effectuating their contract, combination or conspiracy, defendants and their co-conspirators did those things they contracted, combined or conspired to do, including:

a.    Participating in meetings and conversations to discuss the price of trans-Pacific Air Passenger Transportation;

b.    Agreeing to manipulate prices and supply of trans-Pacific Air Passenger Transportation in a manner that deprived direct purchasers of free and open competition;

c.    Issuing price announcements and price quotations in accordance with the agreements reached;

d.    Selling trans-Pacific Air Passenger Transportation to customers in the United States at non-competitive prices.

93.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their business and property in that they have paid more for trans-Pacific Air Passenger Transportation than they otherwise would have paid in the absence of Defendants' unlawful conduct.

CLASS ACTION COMPLAINT          22

1

2

**CLAIM FOR RELIEF**

**For Violation of Section 1 of the Sherman Act
and Section 4 of the Clayton Act**

3

4

94.    Plaintiff realleges and incorporates each and every allegation set forth above as if

fully written herein.

5

6

7

8

95.    From a date unknown, but at least from May 2004, and continuing through August

20007, Defendants and their co-conspirators have combined, conspired and/or contracted to

restrain interstate trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton

Act.

9

10

11

12

13

96.    The contract, combination or conspiracy has resulted in an agreement,

understanding or concerted action between and among Defendants in furtherance of which

Defendants instituted, fixed, maintained, raised or stabilized prices for trans-Pacific Air

Passenger Transportation. Such contract, combination, or conspiracy constitutes a per se

violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

14

15

16

97.    Defendants' contract, combination, agreement, understanding or concerted action

occurred in or affected interstate and international commerce. Defendants' unlawful conduct was

through mutual understandings or agreements by, between and among Defendants.

17

98.    The contract, combination or conspiracy has had the following effects:

18

19

    a.    Prices charged to Plaintiff and the class for trans-Pacific Air Passenger
           Transportation were raised, fixed, maintained or stabilized at higher,
           artificially derived, noncompetitive levels;

20

21

    b.    Plaintiff and the Class have been deprived of the benefits of free,
           open and unrestricted competition in the market for trans-Pacific Air
           Passenger Transportation; and

22

23

    c.    Competition in establishing the prices paid for trans-Pacific Air Passenger
           Transportation been has been unlawfully restrained, suppressed and
           eliminated.

24

25

    d.    As a proximate result of Defendants' unlawful conduct, Plaintiff and the
           Class have suffered injury in that they have paid supracompetitive prices
           for trans-Pacific Air Passenger Transportation.

26

27

28

99.    In furtherance of the unlawful conspiracy, upon information and belief, each of

the Defendants and their co-conspirators has committed overt acts including inter alia:

CLASS ACTION COMPLAINT        23

1
2
    a.    Agreed to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of trans-Pacific Air Passenger Transportation sold in the United States;

3
4
    b.    Communicating with co-conspirators regarding prices to be charged for trans-Pacific Air Passenger Transportation;

5
6
    c.    Meeting with co-conspirators in order to keep the existence of the conspiracy unknown so as to foster the illegal anti-competitive conducted described herein;

7
    d.    Refraining from competition by refusing to offer trans-Pacific Air Passenger Transportation at prices below the agreed-upon fixed price; and

8
    e.    Sold trans-Pacific Air Passenger Transportation at agreed-upon prices.

9    100.    Defendants and their co-conspirators engaged in the activities described above for

10 the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of

11 trans-Pacific Air Passenger Transportation.

12    101.    Defendants' anti-competitive agreement was implemented by, *inter alia*, a series

13 of coordinated price increases, in the form of fuel surcharges, that began in early 2004. These

14 coordinated price increases continued on a regular basis through the present, with the actual and

15 intended result that Plaintiff and members of the Class paid supra-competitive prices for trans-

16 Pacific Air Passenger Transportation. Defendants falsely attributed these price increases to

17 increases in input costs such as energy. As a direct and proximate result of the trans-Pacific Air

18 Passenger Transportation price-fixing conspiracy, Defendants have restrained competition in the

19 trans-Pacific Air Passenger Transportation market and injured Plaintiff and each Class member

20 in their business and property in that they have each paid a higher price for Air Passenger

21 Transportation than they would have paid absent the concerted unlawful activity.

22

23                                **PRAYER FOR RELIEF**

24 WHEREFORE, Plaintiff prays:

25    1.    That the Court determine that the Sherman Act claim alleged herein may be

26 maintained as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil

27 Procedure;

28    2.    That the unlawful conduct, contract, conspiracy or combination alleged herein be

CLASS ACTION COMPLAINT    24

1 | adjudged and decreed to be a restraint of trade or commerce in violation of Section 1 of the
2 | Sherman Act;

3 |       3.     That Plaintiff and the Class recover damages, as provided by federal antitrust
4 | laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against
5 | the Defendants in an amount to be trebled in accordance with such laws;

6 |       4.     That Defendants, their affiliates, successors, transferees, assignees, and the
7 | officers, directors, partners, agents, and employees thereof, and all other persons acting or
8 | claiming to act on their behalf, be permanently enjoined and restrained from in any manner:
9 | (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination
10 | alleged herein, or from entering into any other conspiracy alleged herein, or from entering into
11 | any other contract, conspiracy or combination having a similar purpose or effect, and from
12 | adopting or following any practice, plan, program, or device having a similar purpose or effect;
13 | and (2) communicating or causing to be communicated to any other person engaged in the sale of
14 | trans-Pacific Air Passenger Transportation, information concerning bids of competitors.

15 |       5.     That Plaintiff and members of the Class be awarded pre- and post-judgment
16 | interest, and that that interest be awarded at the highest legal rate from and after the date of
17 | service of the initial complaint in this action;

18 |       6.     That Plaintiff and members of the Class recover their costs of this suit, including
19 | reasonable attorneys' fees as provided by law; and

20 |       7.     That Plaintiff and members of the Class have such other, further, and different
21 | relief as the case may require and the Court may deem just and proper under the circumstances.

22 |
23 |
24 |
25 |
26 |
27 |
28 |

CLASS ACTION COMPLAINT     25

1

2

## **JURY TRIAL DEMAND**

3

    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

4

by jury for all issues so triable.

5

6    Dated: January 25, 2008                    SAVERI & SAVERI, INC.

7

8

9                                              Guido Saveri (22349) (guido@saveri.com)
                                               R. Alexander Saveri (173102) (rick@saveri.com)
10                                             Cadio Zirpoli (179108) (cadio@saveri.com)
                                               111 Pine Street, Suite 1700
11                                             San Francisco, CA 94111
                                               Telephone: (415) 217-6810
12

13                                             REINHARDT WENDORF & BLANCHFIELD
                                               Mark Reinhardt
14                                             Garrett D. Blanchfield, Jr.
                                               E-1250 First National Bank Building
15                                             332 Minnesota Street
                                               St. Paul, MN 55101
16                                             Telephone: (651) 287-2100
                                               Facsimile: (651) 287-2103
17

18                                             Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT              26